IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION FILE |
| JOSE MENDEZ-CANALES, | NO. 4:08-CR-06-HLM-WEJ |
| Defendant. | |

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on defendant Jose Mendez-Canales's Motion to Suppress Statements [17] and his Motion to Suppress Evidence [18]. These Motions arise out of a search of defendant's residence and statements he made to law enforcement following his arrest.

Defendant argues that, because consent to search his residence was not voluntarily given, evidence seized there should be suppressed and his subsequent statements suppressed as fruit of the poisonous tree. He also asserts that, assuming the Court finds that consent was given, agents exceeded the reasonable scope of that consent. (See Def.'s Br. [28] 1-2.) The Government responds that both defendant and his wife voluntarily gave consent to search their residence; thus, the evidence at issue here was lawfully seized and defendant's statements

were not fruit of the poisonous tree. The Government also asserts that law enforcement complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966), when making a custodial interrogation of defendant. (Govt.'s Resp. [29] 1.)

For the reasons explained below, the undersigned **REPORTS** that both defendant and his wife voluntarily consented to a search of their residence; that agents did not exceed the scope of that consent; that defendant's statements are not fruit of the poisonous tree; and that defendant made custodial statements knowingly and intelligently after agents complied with Miranda. Therefore, the undersigned **RECOMMENDS** that both Motions [17, 18] be **DENIED**.

I. STATEMENT OF FACTS[1]

B. Events of December 12, 2007

On December 12, 2007, Special Agent ("SA") Jim Rives of the Department of Homeland Security received a complaint that there was someone working at Garland Sales in Dalton, Georgia, who was not the person she represented herself to be. (Tr. 4-5, 32.) Specifically, human resources personnel at Garland Sales

---

[1] The Court conducted an evidentiary hearing [21] regarding these Motions on June 23, 2016, which was transcribed [24] (hereafter "Tr.").

believed that Bernice Guerrero had presented a fraudulent Texas birth certificate in order to gain employment there. (Id. at 6-7.)

SA Rives went to Garland Sales on December 12 to investigate along with fellow Homeland Security SA Bert Crapps and Dalton Police Detective Chris Johnson. (Id. at 4-6.)[2] SA Rives examined a copy of the Texas birth certificate and suspected it was fraudulent because the birth year contained a typewritten error--someone started to type the year 2000 and then corrected it to the year 1964. (Id. at 9, 32.) When agents questioned Ms. Guerrero in English regarding her identity, she claimed to be the person listed on the Texas birth certificate, and invited them to her residence so that she could show them her original birth certificate and other pieces of identification. (Id. at 7, 54.)[3]

Before accepting Ms. Guerrero's invitation to visit her residence, agents asked her if she would be willing to come to the ICE office in Dalton to be fingerprinted to help establish her identity, and she agreed to go. (Tr. 7-8.) After transporting Ms. Guerreo to the ICE office, agents introduced her to SA Jeff

---

[2] The law enforcement agents/officers involved in this case on this date wore plain clothes and drove unmarked cars. (Tr. 6, 8.)

[3] Although Ms. Guerrero spoke English, it was her second language. She was more comfortable speaking Spanish. (Tr. 31.)

3

Schroder, who spoke to her in a conversational tone. (Id. at 8-9, 51-52.)[4] Upon submission of Ms. Guerrero's fingerprints, agents learned that she did not have an immigration history. (Id. at 9.) Agents also learned that the social security number that Ms. Guerrero presented came back to multiple persons, which indicated identity theft. (Id. at 9-10, 32-33.) Ms. Guerrero was not in handcuffs either at Garland Sales, during the trip to the ICE office, or during her time at the office. (Id. at 8, 10, 52.) She was never touched or threatened in any way. (Id. at 52-53.)

SAs Rives, Crapps, and Schroder, along with Detective Johnson, then travelled to Ms. Guerrero's residence on the afternoon of December 12. (Tr. 10, 54.) They did so for two reasons. First, she needed transportation to her home because she had ridden with agents from Garland Sales to the ICE office. (Id.) Second, she was being very cooperative and wanted to show the agents her

---

[4] SA Schroder is fluent in Spanish. (Tr. 49-41, 73-76.) SA Schroder's practice is to start a conversation in English, but if he sees that the other person is not comprehending, he switches to Spanish. (Id. at 51.) SA Schroder could not recall whether he spoke to Ms. Guerrero in Spanish or English while she was at the ICE office. (Id. at 51.) Regardless of the language used, SA Schroder had no problems communicating with Ms. Guerrero. (Id. at 53.) SA Rives testified that SA Schroder and Ms. Guerrero conversed at the office in a combination of English and Spanish. (Id. at 8-9.)

4

original birth certificate and other identity documents to prove that she was the person she claimed to be. (Id. at 10, 34, 54, 64.)

Upon arrival at Ms. Guerrero's residence, agents met her husband, who introduced himself as either "Arthur Pacheco" or "Arthur Saldate," but who was later identified as defendant, Jose Mendez-Canales. (Tr. 10-11, 13, 56-58.)[5] Ms. Guerrero, followed by an agent, retrieved an original birth certificate from somewhere in the residence and presented it to the agents. (Id. at 54-55, 65.)

With defendant in close proximity, SA Schroder asked Ms. Guerrero for consent to search the residence for other identification documents. (Tr. 11-14, 34, 55.)[6] At this time, Ms. Guerrero was not in handcuffs, no one threatened or touched her, and no one drew a gun upon her. (Id. at 11, 12-13, 55-56.) When SA Schroder asked Ms. Guerrero for consent, her husband was not in handcuffs and no one was touching or threatening him. (Id. at 14, 58-59.) Ms. Guerrero provided verbal consent to search her residence, and displayed that consent with her body language (i.e., she moved to one side). (Id. at 11-12, 34-35, 56.)

---

[5] Defendant did not speak English. (Tr. 59-60.)

[6] Although SA Schroder could not definitely recall if he was the one who asked Ms. Guerrero for consent to search and whether he did so in English or in Spanish (Tr. 55-56, 76-77), SA Rives testified that SA Schroder asked her for consent in Spanish. (Id. at 11.)

5

Defendant did not object to the consent provided by his wife. (Id. at 57.)[7] The agents did not recall Ms. Guerrero placing any limitations on the consent she provided. (Id. at 56.)

In searching the residence, agents found mail addressed to Rebecca Deleon, a bullet, and two bags of suspected marijuana. (Tr. 11, 14, 36, 47.) When confronted, Ms. Guerrero admitted that her true identity was Rebecca DeLeon. (Id. at 15, 67.) Detective Johnson then placed Ms. Guerrero under arrest and transported her to the Whitfield County Jail. (Id. at 15, 35, 66.) SAs Rives, Crapps, and Schroder remained at the residence because they were suspicious of defendant's identity, as well as concerned over the presence of illegal narcotics and a bullet, which indicated the possible illegal possession of firearms by an alien. (Id. at 15-16, 67.)

SA Schroder then asked defendant in Spanish whether there were any firearms in the house and if the agents could have consent to search for them. (Tr.

---

[7] Although SA Rives testified cautiously that defendant provided consent to search along with this wife (see Tr. 14), SA Schroder—the agent who interacted directly with defendant—testified that he could not recall asking anything of defendant at this point except for questions about his identity. (Id. at 57.)

59-60, 67-68, 72-73.)[8]  Although SA Schroder could not remember the exact questions he asked nine years ago, he was certain that defendant gave consent. (Id. at 67-69, 71-73.)  Agents continued to search the residence and found five firearms, two additional bags of suspected marijuana, scales, and small bags indicating the distribution of marijuana.  (Id. at 16, 39, 47.)  SA Rives recalled his belief that one of the firearms was found in a dresser drawer in defendant's bedroom.  (Id. at 38.)

After finding the firearms and suspected marijuana, SA Schroder questioned defendant.  (Tr. 17.)  He was not handcuffed and no guns were drawn on him.  (Id.)  None of the agents touched defendant or threatened him in any way during this questioning.  (Id.)  Agents elected not to place defendant under arrest at this time because a minor child had recently arrived home from school; if

---

[8] SA Rives could not recall if SA Schroder asked defendant for consent to search after his wife was arrested and transported to jail.  (Tr. 16, 35-36.)  He believed that the earlier consent received from Ms. Guerrero, provided with no objection from her husband, was sufficient.  (Id.)  SA Schroder testified that he asked defendant and his wife (before she was transported to jail) if there were any guns in the house, and he believed that they replied in the negative; however, SA Schroder was certain that he asked defendant for consent to search the residence for weapons and that defendant provided consent.  (Id. at 67-73.)

7

defendant were taken into custody, there would be no one at home to care for him given his mother's arrest. (Id. at 18.)

### B. Events of January 4, 2008

On January 4, 2008, SA Rives and officers from the Calhoun Police Department arrested defendant for identity theft at his workplace in Calhoun, Georgia. (Tr. 21-22.) Defendant was neither questioned there nor during the car ride to the ICE office. (Id.) At the ICE office, agents ran defendant's fingerprints through a database and obtained his true identify, which showed that he had a previous narcotics conviction. (Id. at 23.) Calhoun Police Sergeant Jay Marquez advised defendant of his Miranda rights in Spanish in a conversational tone by reading from a form printed in Spanish. (Id. at 23, 26; see also Gov't Ex. 1.) Defendant indicated that he read and understood Spanish. (Tr. 27.) After having been given the opportunity to read the waiver in Spanish, and after stating that he understood his rights, defendant executed a written waiver of his rights by signing the name "Jose Mendez." (Id. at 23-24, 27.) The Spanish language waiver of Miranda rights executed by defendant (Gov't Ex. 1) contains the same terms as the English language version of the Miranda waiver (Gov't Ex. 2). (Tr. 25-26, 60-62.) At no point, from his encounter with law enforcement at his workplace

through his interrogation, did law enforcement officers threaten or touch defendant or brandish weapons at him.  (Id. at 21-23, 26.)

## II.   THE INDICTMENT

On February 13, 2008, a grand jury in the Northern District of Georgia returned a one-count Indictment [1] against defendant, charging him with being an alien in possession of firearms in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).  The Indictment also contains a forfeiture provision.

## III.   ANALYSIS

### A.   Defendant's Motion to Suppress Evidence

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  A search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specifically established and well-delineated exceptions.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  "One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Id.

9

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). In considering whether consent to search was voluntarily given, the Court examines the totality of the circumstances. United States v. Tovar-Rico, 61 F.3d 1529, 1535 (11th Cir. 1995). Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.'" United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989)). The absence of official coercion is a sine qua non of effective consent, as it is axiomatic that "'[w]here there is coercion, there cannot be consent.'" United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996) (quoting Bumper v. North Carolina, 391 U.S. 543, 550 (1968)); see also Florida v. Bostick, 501 U.S. 429, 438 (1991) ("'Consent' that is the product of official intimidation . . . is not consent at all.").

The Eleventh Circuit has identified a non-exhaustive list of relevant factors to consider when assessing whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the

10

defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.  United States v. Blake, 888 F.2d 795, 798-99 (11th Cir. 1989); see also United States v. Simms, 385 F.3d 1347, 1355 (11th Cir. 2004).

Defendant argues that the Government failed to met its burden of showing that he and his wife consented to the search of their residence because, given the passage of time, the agents who testified had a limited memory of the circumstances of that day.  (Def.'s Br. 12.)  Although it is not surprising that SA Schroder had some difficulty recalling details of an event that happened almost nine years ago, the Court finds that the way he testified—stating what he could recall and candidly admitting what he could not—made him credible.  Indeed, the Court credits the testimony of both SA Rives (whose recollection had been refreshed by the report he prepared at the time of the events in question) and SA Schroder.  See United States v. Ramirez-Chilel, 289 F.3d 744, 748–49 (11th Cir. 2002) (explaining that the Circuit defers to the district court's credibility determination made during a suppression hearing unless that determination is "contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it").

11

Thus, the Court finds that, based on the testimony of the two agents, defendant's wife first gave voluntary consent to search the residence for identification documents, and that defendant did not object. His failure to object equals acquiescence. See United States v. Travis, 311 F. App'x 303, 310 (11th Cir. 2009). The Court further finds that, based on the testimony of the two agents, defendant gave voluntary consent to search the residence for firearms. Defendant provided no contrary testimony.

As for the various Blake factors regarding voluntariness, neither defendant nor his wife were in custody. 888 F.2d at 798-99. There were no coercive police procedures. See United States v. Drayton, 536 U.S. 194, 204 (2002) (no coercion when "there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice"). The presence of armed officers is not coercive. See United States v. Perez, 443 F.3d 772, 778 n.2 (11th Cir. 2006). That defendant and his wife are illegal immigrants is immaterial. See United States v. Maldonado, No. 1:12-CR-319-TCB-LTW, 2013 U.S. Dist. LEXIS 182720, at *32, 37-38 (N.D. Ga. Dec. 20, 2013) (rejecting defendant's argument that there was police coercion because he was an uneducated,

undocumented alien surrounded by multiple armed agents and finding that defendant voluntarily consented to the search of his vehicle and residence).

Additionally, with regard to cooperation, defendant's wife invited agents to her home and went out of her way to be helpful, and there is no evidence that defendant was uncooperative.  Although there was no evidence whether defendant or his wife were aware of the right to refuse to consent to the search, the Government is not required to inform suspects of this right.  See Schneckloth, 412 U.S. at 231-32.[9]  As for the education and intelligence factor, defendant told agents that he could read and write Spanish, and that was the language used when communicating with him.  Moreover, his wife was obviously a person of intelligence because she spoke two languages.  Finally, both defendant and his wife quickly granted consent to search because they apparently believed that no incriminating evidence would be found.  See United States v. Barrueta, No. 208-CR-91-FTM-29SPC, 2008 WL 4642793, at *15 (M.D. Fla. Oct. 17, 2008) ("The fact that the Defendant so readily agreed to the search is a strong indication the Defendant did not believe anything illegal would be found . . .").  Thus, the

---

[9] A case cited by defendant, United States v. Chemaly, 741 F.2d 1346 (11th Cir. 1984), is inapposite to the facts here.

13

consent provided by defendant and his wife was not a function of acquiescence to a claim of lawful authority, but rather given freely and voluntarily.

The Court also rejects defendant's argument that agents exceeded the scope of the consent he and his wife provided. "'When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather, it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.'" United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (quoting United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990)). In conducting the reasonableness inquiry, the court must consider what the parties knew at the time to be the object of the search. Florida v. Jimeno, 500 U.S. 248, 251 (1991). Permission to search a specific area for narcotics, for example, may be construed as permission to search any compartment or container within the specified area where narcotics may be found. Id. On the other hand, general permission to search does not include permission to inflict intentional damage to the places or things to be searched. See Strickland, 902 F.2d at 941-42 (defendant's permission to search automobile for contraband could not reasonably be construed to include permission to slash spare tire).

Defendant's wife gave consent to search for identity documents. Defendant gave consent to search for firearms. The parties obviously knew the objects of the two searches and that both identity documents and firearms are small enough to be secreted anywhere in the residence. See United States v. Woods, 445 F. Supp. 2d 1328, 1332 (M.D. Ala. 2006) ("A general consent to search for specific items is reasonable if it is limited to any compartment or container that might reasonably contain those items."); accord United States v. Zapata, 180 F.3d 1237, 1243 (11th Cir. 1999). The Court is not left to guess concerning the scope of the search because defendant and his wife provided consent to search wherever theses items might have been hidden, and there is no evidence that agents exceeded that consent by, for example, destroying any of defendant's property. Thus, the Motion to Suppress Evidence should be **DENIED**, both because there was consent and the search did not exceed the scope of that consent.

B. **Defendant's Motion to Suppress Statements**

Defendant does not argue that agents failed to follow Miranda's requirements and that he did not understand his rights. Instead, he argues that the illegal search of his residence rendered his subsequent statements fruit of the poisonous tree. However, given that the search of defendant's residence was

15

legal, the statements he made should not be suppressed as fruit of the poisonous tree. See United States v. Lopez–Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009) (finding that defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated").

It is undisputed that, before his custodial interrogation, defendant indicated that he read and spoke Spanish; a Spanish-speaking officer read the waiver form to him in Spanish; defendant had the opportunity to read the form for himself; defendant indicated that he understood his rights; and he executed a written waiver of those rights. Officers did not threaten defendant or promise him anything in return for waiving his Miranda rights. Because defendant waived his rights knowingly and intelligently, his Motion to Suppress Statements should be **DENIED**.

## IV. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [17] and his Motion to Suppress Evidence [18] be **DENIED**.

**SO RECOMMENDED**, this 12th day of September, 2016.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE